IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM MESMER                    :

                                  :

    v.                            :        Civil Action No. DKC 10-1053

                                  :

ST. MARY'S COUNTY, et al.         :

                                  :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this civil rights action are two motions: a motion to dismiss or, in the alternative, for summary judgment filed by Defendants Maryland State Police, et al. (ECF No. 17); and a motion to dismiss or, in the alternative, for summary judgment filed by Defendants St. Mary's County, et al.[1] (ECF No. 12). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion filed by Defendants Maryland State Police, et al. will be granted in part and denied in part, while the motion filed by Defendants St. Mary's County, et al. will be granted.

---

[1] Three defendants – Andre Hill, Elizabeth Shaffer, and Karen Porter – were not served with process. For reasons that will become apparent, they would have been entitled to summary judgment had they been served. Accordingly, they will be dismissed from the case without further service of process or response. *See, e.g.*, *Ali v. Corr. Med. Servs., Inc.*, No. DKC-09-0466, 2009 WL 2713948, at *1 n.1 (D.Md. Aug. 25, 2009).

## I. Background

### A. Factual Background

Almost all of the material facts in this case are in dispute. The parties agree that Maryland State Police troopers arrested Plaintiff William Mesmer on the morning of March 27, 2009. They also agree that Mesmer struck his head during the course of his arrest and processing. After that injury, he was taken to St. Mary's County Detention Center ("SMCDC") and, eventually, a hospital. Beyond those basic facts, there is little agreement.

According to Mesmer's verified complaint, Mesmer left Rick's Restaurant in California, Maryland at 1:00 am on the night in question and drove south on his motorcycle on Maryland Rt. 235. (ECF No. 1, at 11). As he was driving, a car in front of Mesmer suddenly braked, causing him to swerve around the car. (*Id.*). When Mesmer tried to stop his bike, it slid forward into an intersection and spun into the northbound lane of Rt. 235. (*Id.*). Mesmer attributes the slide to a wet and oily driving surface. (*Id.*).

Mesmer then drove north on Rt. 235. (*Id.*). Because he wanted to clean the oil off his tires, he accelerated while "slipping the clutch of the motorcycle[,] causing the rear tire to spin." (*Id.*). Mesmer admits that, because he was trying to

clean his tires and because of a "huge rush of adrenaline," he went faster than the posted speed limit. (*Id.*).

Shortly thereafter, Mesmer saw police lights and pulled over to the side of the road. (*Id.* at 12). Once he pulled over, five state and county officers – including Defendant Maryland State Police Trooper First Class Robert Rezza – surrounded him in four cruisers. (*Id.*). Mesmer says she did not resist. (*Id.*).

When asked whether he had been drinking, Mesmer told the officers that he had one beer with his dinner at 6:30 pm. (*Id.*). Rezza told Mesmer his breath was "strong," but Mesmer explained he had a "slight case of halitosis." (*Id.*). Nevertheless, Rezza and the troopers decided that Mesmer should take a field sobriety test. (*Id.*). According to Mesmer, the test was unfair in several respects. The troopers refused Mesmer's requests to take off his "leathers" and take the test on level ground. (*Id.*). Rezza confusingly demonstrated three different ways to perform the "heel toe" test and forced Mesmer to perform the test in boots, on an uneven surface, in the cold night air, with cruiser lights flashing in his eyes. (*Id.*). Despite these conditions, Mesmer states that he "performed [the] one leg stand test better than the trooper demonstrated." (*Id.*).

Mesmer states that it soon became clear to him that the troopers were going to arrest him "no matter how much [he] protested about the conditions under which [he] was being examined." (*Id.* at 13). He asked that a federal marshal be present; the officers laughed. (*Id.*). Mesmer then refused to take a breathalyzer test "due to advice of counsel." (*Id.*). The officers placed Mesmer in handcuffs and arrested him without reading him his Miranda rights. (*Id.*).

Rezza transported Mesmer back to the State Police barracks. Mesmer alleges that during that transport he told Rezza that he would submit to a breathalyzer at the barracks. (*Id.*). Rezza responded by asking Mesmer why he believed he was entitled to have a marshal present at his arrest, and asked Mesmer if he was a lawyer. (*Id.*). Mesmer continued to insist that he was not intoxicated and "was not ignorant of the law or the Constitution of the United States." (*Id.* at 13-14). In reply, Rezza purportedly pointed his finger in Mesmer's face and shouted, "You have no constitutional rights!" (*Id.* at 14).

Mesmer's verified complaint states that, upon arrival at the barracks, he was placed in a room for processing with Rezza, Defendant Sergeant Roger Redmond, and an unnamed third officer.[2]

_____

[2]     Mesmer's verified complaint emphasizes that the third officer was *not* Linger. (ECF No. 1, at 14).

(*Id.*).   The officers asked Mesmer to read a piece of paper concerning his refusal to take a breathalyzer, but Mesmer could not do so because he remained handcuffed.   (*Id.*).   Rezza then left the room; before leaving, Rezza allegedly told the officers, "[I]f he so much as twitches, slam him." (*Id.*).

After Rezza left the room, Mesmer began telling the officers that Rezza had violated his constitutional rights. (*Id.*).   They yelled at him to shut up.   (*Id.*).   Mesmer then reached for the piece of paper he had been given to read earlier.   (*Id.*).   When he moved, the two troopers allegedly rushed him at the same time, slammed his head through the wall "into the brick on the other side," spun him around, pinned his legs, punched him in the jaw, and choked him to unconsciousness with a forearm to the throat.   (*Id.*).   Rezza returned after this assault.   (*Id.*).   Mesmer regained partial consciousness and heard the troopers brag to Rezza about the attack.   (*Id.* at 15).

Mesmer states that he was then taken to SMCDC.   (*Id.*). There, he told the corrections officers what happened at the barracks and asked to see a doctor.   (*Id.*).   The officers refused.   (*Id.*).   He was placed in a holding cell, where he blacked out.   (*Id.*).   When the officers came to retrieve him from the holding cell, Mesmer again asked for medical treatment and was refused.   (*Id.*).   Instead, the officers declared Mesmer uncooperative and placed him back in the holding cell, where he

"blacked out again for several more hours." (*Id.*). After this black out period, Defendant Corporal Stephen Goddard came to the holding cell and ordered Mesmer to his feet; when Mesmer stood, he blacked out once more. (*Id.*).

The verified complaint states that Goddard then told Mesmer to take a breathalyzer test before he could receive treatment. (*Id.* at 16). After Mesmer blew a 0.0 on the breathalyzer and blood tests showed a normal glucose level, medical personnel responded and asked him what had happened to him. (*Id.*). Mesmer again told them about the incident at the police barracks. (*Id.*). Mesmer alleges that instead of giving him treatment, however, the corrections officers "stuffed [him] in a wheelchair while [he was] vomiting [and] very quickly propped [him] up in front of the Commissioner." (*Id.*). After that appearance, Mesmer was placed in an ambulance and transported to St. Mary's Hospital, eight hours after the initial injury. (*Id.*). Mesmer states that, once at the hospital, he was diagnosed with a severe head concussion. (*Id.*). He alleges that he continues to suffer from a variety of ailments stemming from the incident. (*Id.* at 16-17).

Defendants take a sharply different view of the facts.

Rezza states that he was driving south on Maryland Rt. 235 in California early on the morning on March 27. (ECF No. 17-3, Ex. 2 ¶ 2). As he drove on Rt. 235, Rezza saw a motorcycle pull

6

out of the Hickory Hills Shopping Center, home of the "ABC Tavern." (*Id.* ¶ 3). The motorcycle proceeded down Rt. 235 in the same direction as Rezza, making several "S" turns and weaving through different lanes of traffic. (*Id.*).

The motorcycle then pulled behind a car stopped at a red light. (*Id.* ¶ 4). Instead of stopping behind the car, however, the motorcycle drove around the stopped car, through the red light, and into the intersection. (*Id.*). Once in the intersection, the motorcycle made a U-turn and returned north on Rt. 235. (*Id.*).

Rezza followed the motorcycle, clocking it at 80 miles per hour with radar, even though the road had a posted speed limit of 45 miles per hour. (*Id.* ¶ 5). As the motorcycle approached Maryland Rt. 4, it slowed; Rezza then hit his emergency lights. (*Id.* ¶ 6). The motorcycle turned off onto Rt. 4 and stopped. (*Id.*). After getting out of his car, Rezza approached the motorcycle and met the driver, Mesmer. (*Id.* ¶ 7).

"Immediately upon contact," Rezza smelled alcohol on Mesmer's breath. (*Id.* ¶ 8). The trooper noted that Mesmer's eyes were red and watery, and that Mesmer spoke in a loud and slurred voice. (*Id.*). Mesmer also admitted that he had had a beer at the ABC Tavern. (*Id.*). When the trooper asked Mesmer to produce identification, Mesmer provided an expired Virginia license. (*Id.* ¶ 10). A records check did not indicate any

valid driver's license for Mesmer in Maryland, Virginia, or Florida.[3] (*Id.*). Rezza also noted that Mesmer became "more and more belligerent and difficult" over the course of the stop. (*Id.* ¶ 12).

Mesmer agreed to perform the Standardized Field Sobriety Tests, the results of which led Rezza to believe that Mesmer was intoxicated.[4] (*Id.* ¶ 11). When Rezza asked Mesmer to take a preliminary breath test, he refused. (*Id.* ¶ 12). The trooper placed Mesmer under arrest and handcuffed him. (*Id.*).

Rezza took Mesmer to the Leonardtown Barrack for processing. (*Id.* ¶ 13). Rezza alleges that throughout the trip back to the barracks, Mesmer repeatedly demanded a "federal marshal," while insisting that the trooper had violated his federal, constitutional, and civil rights. (*Id.*; ECF No. 17-7, Ex. 6). When asked during the ride if he would consent to an intoximeter test[5] at the barracks, Mesmer would only respond, "You can do your best." (ECF No. 17-7, Ex. 6). Redmond, who

---

[3]    Mesmer's bike displayed expired Florida tags. (ECF No. 17-3, Ex. 2 ¶ 9).

[4]    The results of the test are described in detail in the Alcohol Influence Report prepared by Rezza. (ECF No. 17-4, Ex. 3, at 2-4). All three tests that Rezza administered indicated intoxication. (*Id.*).

[5]    "An intoximeter test determines a suspected intoxicated driver's blood alcohol level." (ECF No. 17-3, Ex. 2 ¶ 15).

was the duty sergeant at Leonardtown Barrack on the night in question, also heard Rezza "screaming over the radio." (ECF No. 17-5, Ex. 4 ¶ 3).

At the barracks, Redmond and Defendant Corporal Jeffrey Linger met Rezza. (ECF No. 17-3, Ex. 2 ¶ 14; ECF No. 17-6, Ex. 5 ¶ 3). Mesmer's mood did not improve at the barracks, as Mesmer remained uncooperative and cursed at Maryland State Police personnel. (ECF No. 17-3, Ex. 2 ¶ 14; ECF No. 17-5, Ex. 4 ¶ 4). He refused to give his address and spoke in a slurred voice. (ECF No. 17-3, Ex. 2 ¶ 14; ECF No. 17-6, Ex. 5 ¶ 4). Mesmer was then escorted into a processing room to discuss his rights relating to an intoximeter test. (*Id.;* ECF No. 17-5, Ex. 4 ¶ 5). Because he was still acting disruptive, Mesmer remained handcuffed. (ECF No. 17-3, Ex. 2 ¶ 14; ECF No. 17-5, Ex. 4 ¶ 5; ECF No. 17-6, Ex. 5 ¶ 4).

The troopers contend that they provided Mesmer with a DR-15 form about his right to consent or refuse the intoximeter test. (ECF No. 17-3, Ex. 2 ¶ 15; ECF No. 17-8, Ex. 7). When Rezza tried to read Mesmer his rights, Mesmer continued acting argumentative and disruptive. (ECF No. 17-3, Ex. 2 ¶ 15; ECF No. 17-5, Ex. 4 ¶ 6; ECF No. 17-6, Ex. 5 ¶ 5). He refused to take the test and would not to sign the form stating that refusal. (*Id.*).

Rezza left the room to retrieve the citations he was going to give Mesmer from his car, leaving Mesmer alone with Redmond and Linger.  (ECF No. 17-3, Ex. 2 ¶ 16; ECF No. 17-5, Ex. 4 ¶ 7; ECF No. 17-6, Ex. 5 ¶ 6).  Mesmer sat on a bench next to the wall, while Linger and Redmond sat at desks next to the bench.  (ECF No. 17-5, Ex. 4 ¶ 7; ECF No. 17-6, Ex. 5 ¶ 6).

Mesmer began directing insults towards Linger and Redmond, calling them "skinheads, Neo-Nazis, and totalitarian socialistic communists."  (ECF No. 17-5, Ex. 4 ¶ 8; ECF No. 17-6, Ex. 5 ¶ 7).  He told the troopers that they would "all hang from the gallows" and that he would "sit in the front row and watch [them] die."  (*Id.*).

Suddenly, Mesmer leapt from the bench, fumbled with his handcuffs, and lunged towards Linger, shouting, "Here you go, here you go."  (ECF No. 17-5, Ex. 4 ¶ 9; ECF No. 17-6, Ex. 5 ¶ 8).  Redmond says that he thought Mesmer was trying to assault Linger and was concerned Mesmer had freed himself from his handcuffs.  (ECF No. 17-5, Ex. 4 ¶ 9).  Redmond therefore "intercepted" Mesmer, using his hands and arms to pin him against the wall.  (ECF No. 17-5, Ex. 4 ¶ 10; ECF No. 17-6, Ex. 5 ¶ 9).  Mesmer remained pinned until Redmond confirmed the handcuffs were secure and felt Mesmer relax.  (ECF No. 17-5, Ex. 4 ¶ 10).  While checking the handcuffs, Redmond found a balled up copy of the advice of rights form in Mesmer's hand.  (ECF No.

17-5, Ex. 4 ¶ 10). Mesmer told Redmond, "I won't stand up again! I got to give you your paper back." (ECF No. 17-5, Ex. 4 ¶ 10; ECF No. 17-6, Ex. 5 ¶ 9). Redmond then sat Mesmer down on the bench. (ECF No. 17-5, Ex. 4 ¶ 10). Redmond states that he did not slam Mesmer's head against the wall, choke him, or strike him. (*Id.* ¶ 14).

The troopers admit that the scuffle between Mesmer and Redmond left indentations in the drywall behind the bench (ECF No. 17-5, Ex. 4 ¶ 12; ECF No. 17-3, Ex. 2 ¶ 17; ECF No. 17-6, Ex. 5 ¶ 11), which can also be seen in pictures that Redmond took after the incident (ECF No. 17-9, at 1 & 4). Redmond observed a smear of blood on the bench where Mesmer was sitting. (ECF No. 17-5, Ex. 4 ¶ 12).

According to the troopers, Redmond attempted to administer first aid when Mesmer complained that his ear hurt. (ECF No. 17-5, Ex. 4 ¶ 12). Mesmer, however, moved his head and prevented the troopers from administering the aid. (ECF No. 17-5, Ex. 4 ¶ 12; ECF No. 17-3, Ex. 2 ¶ 18; ECF No. 17-6, Ex. 5 ¶ 11). While Mesmer was moving, Redmond noticed a small abrasion on Mesmer's right ear lobe. (ECF No. 17-5, Ex. 4 ¶ 12). Redmond tried to photograph the injury, but Mesmer continued to move and shift. (ECF No. 17-5, Ex. 4 ¶ 13; ECF No. 17-6, Ex. 5 ¶ 12).

Rezza returned and the troopers completed the remaining paperwork. (ECF No. 17-5, Ex. 4 ¶ 14; ECF No. 17-6, Ex. 5 ¶ 13). Mesmer did not complain anymore about his injury or ask to be taken to the hospital. (ECF No. 17-3, Ex. 2 ¶ 18; ECF No. 17-5, Ex. 4 ¶ 14; ECF No. 17-6, Ex. 5 ¶ 13). He was then transported to the SMCDC. (ECF No. 17-5, Ex. 4 ¶ 15; ECF No. 17-3, Ex. 2 ¶ 19; ECF No. 17-6, Ex. 5 ¶ 14).

Mesmer was received at SMCDC at about 3:30 a.m.[6] (ECF No. 12-2, Ex. 1, at 28). When he arrived, a preliminary blood test indicated that Mesmer had a blood alcohol level of 0.07. (ECF No. 12-3, Ex. 2, at 3). The booking officer, Defendant Correctional Officer George Hayden, also noted that Mesmer was intoxicated and uncooperative. (ECF No. 12-2, Ex. 1, at 11, 31, 35). Defendant Officer Andre Hill searched and photographed Mesmer. (ECF No. 12-2, Ex. 1, at 10).

After the booking process was finished, Mesmer was put in holding tank T (*id.* at 11), a cell typically used for new detainees still under the influence of alcohol. Mesmer did not complain of any injuries during the booking process, and the Offender Medical Screening Report reflects that Mesmer had no

---

[6] This information detailing Mesmer's time at SMCDC comes from the Detention Center's authenticated medical records. (ECF No. 12-2, Ex. 1, at 8)

"cuts, bruises, or broken bones" at admission.  (ECF No. 12-3, Ex. 2, at 1).

Almost seven hours after his admission to the Detention Center, at 11:00 a.m., Mesmer complained to Goddard that he had blurred vision and a pain on the right side of his head.  (ECF No. 12-2, Ex. 1, 27-28).  When Goddard attempted to take Mesmer to the Medical Unit, Mesmer fell.  (*Id.* at 27).  Goddard helped Mesmer to the floor and radioed for medical assistance.  (*Id.*).  Defendant medics Elizabeth Shaffer and Cassie Shorter responded, along with Defendants Correctional Officer Austin Bernard, Sergeant Krista A. Morazes, and Lieutenant Sarah Norris.  (*Id.* at 27-28).

Defendants state that it was at this point that Mesmer told responders that he had suffered a head injury at the Maryland State Police barracks – namely that he had been "choked and slammed into a wall."  (*Id.* at 29).  Morazes contacted the State Police to find out what had happened and learned about the incident in the processing room.  (*Id.*).  Morazes then passed that information to the medical staff.  (*Id.*).

The medical staff checked Mesmer's vital signs, his blood sugar content, his blood pressure, and his respiration.  (*Id.*; (ECF No. 12-3, Ex. 2, at 3).  Mesmer was alert and conscious, but complained of nausea, dizziness, headache, and a pain in his jaw.  (ECF No. 12-3, Ex. 2, at 3).  There were no contusions,

abrasions, swelling, or lacerations on Mesmer's head. (*Id.* at 2).

Defendant Nurse Karen Porter decided that Mesmer should be taken to St. Mary's Hospital for an examination for possible head trauma. (ECF No. 12-2, Ex. 1, at 28; ECF No. 12-3, Ex. 2, at 3). Mesmer first went before the District Court Commissioner at noon, who released Mesmer on his own recognizance. (ECF No. 12-2, Ex. 1, at 19). Mesmer was released from the Detention Center and transported by ambulance to the hospital at approximately 12:25 p.m. (*Id.* at 9, 28).

Defendants note that Mesmer told doctors at the hospital that he had his head slammed against a wall. (ECF No. 20-2, at 5). He complained of nausea, headache, and left jaw pain. (*Id.*). A physical examination revealed no deformities, while a CT scan revealed no head injuries. (*Id.* at 6). Defendants allege that a doctor nevertheless diagnosed Mesmer with a concussion or head injury and prescribed phenergan (for nausea) based solely on Mesmer's self-reported "injuries." (*Id.*).

Rezza gave Mesmer a total of nine citations: (1) driving under the influence of alcohol, (2) driving while impaired by alcohol, (3) negligent driving, (4) reckless driving, (5) driving with an expired license, (6) driving without a license, (7) exceeding the speed limit, (8) driving without registration, and (9) failure to stop at a red light. (ECF No. 17-3, Ex. 2 ¶

20). On October 15, 2009, a jury convicted Mesmer of all nine citations in a trial in the Circuit Court for St. Mary's County. (ECF No. 17-10, Ex. 9, at 5-6). Mesmer was sentenced to one year of imprisonment (with all but ten days suspended) and 18 months of supervised probation. (*Id.* at 5).

**B.  Procedural Background**

Mesmer filed a complaint pursuant to 42 U.S.C. § 1983 with this court on April 28, 2010 (ECF No. 1), along with a motion for leave to proceed in forma pauperis (ECF No. 2). That complaint alleged several claims against several defendants. In an order dated May 7, 2010, the court permitted Mesmer to proceed with two claims, alleging excessive force and denial of medical care. (ECF No. 5). The complaint asserts a claim of excessive force against the Maryland State Police, Rezza, Redmond, and Linger. (ECF No. 1, at 13-14). It asserts a claim of denial of medical care against the same defendants,[7] as well as the St. Mary's County Sheriff, Department of Corrections; Hayden; Bernard; Hill; Morazes; Norris; Porter; and Goddard. (*Id.* at 14-15). Mesmer was permitted to proceed in forma pauperis. (ECF No. 7). Mesmer also filed a motion for

_____

[7]    It is somewhat unclear whether the denial of medical care claim is in fact asserted against the State Police Defendants. Because the State Police Defendants assume that it does, the court will assume that it does as well.

discovery (ECF No. 10), which the court denied as premature (ECF No. 11).

On July 9, 2010, St. Mary's County, the St. Mary's County Sheriff, Department of Corrections, Hayden, Bernard, Morazes, Goddard and Norris (collectively, the "St. Mary's Defendants") moved to dismiss or, alternatively, for summary judgment. (ECF No. 12). The Maryland State Police, Rezza, Redmond, and Linger (collectively, the "State Police Defendants") followed with their own motion to dismiss/motion for summary judgment on August 11, 2010. (ECF No. 17). Mesmer filed a separate opposition to each motion. (ECF Nos. 16, 20).

## II.  Standard of Review

Both the St. Mary's Defendants and the State Police Defendants have moved to dismiss or, in the alternative, for summary judgment. A court considers only the pleadings when deciding a Rule 12(b)(6) motion to dismiss. Because both motions rely extensively on matters outside the pleadings, the court will construe them as motions for summary judgment. *See* Fed.R.Civ.P. 12(b); *Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir. 2005); *Offen v. Brenner*, 553 F.Supp.2d 565, 568 (D.Md. 2008).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See*

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, summary judgment is inappropriate if there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be

"sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. (citations omitted).

As the court explained in its prior memorandum opinion in this case, the court affords Plaintiff some latitude given his status as a pro se litigant. *See Mesmer v. St. Mary's Cnty.*, No. DKC-10-1053, 2010 WL 1881772, at *1 (D.Md. May 7, 2010). Even with this understanding, however, the court cannot "assume the existence of a genuine dispute of material fact where none exists." *Id*.

## III. Analysis

Mesmer brings his claims under 42 U.S.C. § 1983. To prevail on a claim pursuant to Section 1983, a plaintiff must prove that (1) the defendant deprived him of a right secured by the Constitution or the laws of the United States, and (2) and the deprivation was achieved by defendants acting under color of state law. *Paul v. Davis*, 424 U.S. 693, 696-97, *reh'g denied*, 425 U.S. 985. Mesmer asserts that Defendants deprived him of constitutional rights by using excessive force and denying him medical care.

**A.    Excessive Force**

Mesmer first argues that the State Police Defendants used excessive force during the March 2009 incident. "Excessive force claims of a pretrial detainee [like Mesmer] are governed by the Due Process Clause of the Fourteenth Amendment." *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) (quoting *Young v. Prince George's Cnty., Md.*, 355 F.3d 751, 758 (4th Cir. 2004)). The protections of the Fourth Amendment "do not extend to arrestees and pretrial detainees." *Id.*

To succeed on an excessive force claim, Mesmer must show that the troopers "inflicted unnecessary and wanton pain and suffering" on him. *Whitley v. Albers*, 475 U.S. 312, 320 (1986); *accord Orem*, 523 F.3d at 446; *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006). Determining whether that standard has been met "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley*, 475 U.S. at 320 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2$^{d}$ Cir. 1973)). Other factors worthy of consideration in determining whether the "constitutional line has been crossed" include "the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted." *Orem*, 523 F.3d at 446 (quoting *Johnson*, 481 F.2d at 1033). Force becomes constitutionally

excessive when it essentially "amounts to punishment." *United States v. Cobb*, 905 F.2d 784, 788 (4th Cir. 1990), *cert. denied sub nom. Hatcher v. United States*, 498 U.S. 1049 (1991) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)).

There is a genuine dispute of material fact as to whether the force the officers used against Mesmer was excessive. If the officers' accounts are credited, the force was likely a reasonable response to the potential threat that Mesmer posed to one or more of the officers. They contend that Mesmer was increasingly hostile and unpredictable as the night wore on. They characterize the force as mere restraint of a potentially violent detainee, not an attack.

But Mesmer's sworn statements, which also must be credited at this juncture, tell a much different story.[8] He recalls that the officers launched a brutal and unprovoked attack on him while he was restrained in handcuffs. That gratuitous attack left him with substantial injuries that continue to plague him.

---

[8] State Police Defendants contend that Mesmer has not provided any evidence on summary judgment. But the court must also consider the facts provided in the verified complaint, which was signed under penalty of perjury. (ECF No. 1, at 25). "A *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (emphasis in original). Although the complaint is not notarized, the court may still consider it because it was sworn under penalty of perjury. *See* 28 U.S.C. § 1746(2).

(ECF No. 1, at 16-17).[9]  These facts are enough to support his
claim for excessive force.  As the United States Court of
Appeals for the Fourth Circuit recently explained in the
analogous context of arrestees, it cannot be said, "as a matter
of law, that knocking down, punching, and kicking an
[individual] while he is in handcuffs are actions taken in good
faith to restore order."  *McMillian v. Wake Cnty. Sheriff's
Dep't*, No. 10-1576, 2010 WL 4366478, at *3 (4th Cir. Oct. 28,
2010).

State Police Defendants also contend that their actions are
protected by qualified immunity.  The doctrine of qualified
immunity shields government officials "from liability for civil
damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known."  *Harlow v. Fitzgerald*, 457
U.S. 800, 818 (1982).  In determining whether qualified immunity
applies, the court must make two determinations.  First, it must
consider whether, "[t]aken in the light most favorable to the

---

[9]    The State Police Defendants argue that Mesmer suffered
only an abrasion to his ear.  In their view, this *de minimis*
injury is insufficient to support an excessive force claim.  The
Supreme Court has rejected the notion that *de minimis* injury is
decisive in the Eighth Amendment context, *Wilkins v. Gaddy*, 130
S.Ct. 1175, 1179-80 (2010), and there is much to suggest that
they would do the same when applying the Fourteenth Amendment.
Even if this were not the case, the head and jaw injuries that
Mesmer has alleged are not properly characterized as *de minimis*.

party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the evidence does establish a violation of a constitutional right, the court should assess whether the right was "clearly established" at the time of the events at issue. *Id.*[10] "The answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (quoting *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)).

As explained above, Mesmer has made a sufficient showing at this stage that the officers violated his Fourteenth Amendment rights by employing excessive force. The only remaining question then is whether the right was clearly established at the time of the events, such that officials had "'fair warning' that their conduct was unconstitutional."[11] *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006). "[T]he contours of the right must be sufficiently clear that a

---

[10]    The court may decide which question to consider first "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

[11]    "The existence of disputed material facts – which must be submitted to a jury – does not alter the 'essentially legal' nature of the question of whether the right at issue was clearly established." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005).

reasonable official would understand that what he is doing
violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640
(1987). "[A]lthough the exact conduct at issue need not have
been held to be unlawful in order for the law governing an
officer's actions to be clearly established, the existing
authority must be such that the unlawfulness of the conduct is
manifest." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998),
*aff'd*, 526 U.S. 603 (1999). If the right was not clearly
established, the qualified immunity doctrine shields a defendant
officer from liability.

State Police Defendants have not established that they are
entitled to qualified immunity. A reasonable officer in early
2009 would obviously have understood that a brutal, unprovoked
attack on a handcuffed detainee would violate that detainee's
constitutional rights. *See, e.g.*, *Simms v. Bruce*, 104 F.App'x
853, 857 (4th Cir. 2004) ("[I]n September of 1998, it was clearly
established that pre-trial detainees were protected from wanton
beatings that exceeded good faith efforts to restore order.");
*Short v. Walls*, No. 2:07-00531, 2009 WL 914085, at *9 (S.D.W.Va.
Mar. 31, 2009) ("The administration of a beating for purposes
other than to restore or maintain prison security or the
plaintiff's own safety violates clearly established law.");
*Stewart v. Beaufort Cnty.*, 481 F.Supp.2d 483, 491 (D.S.C. 2007)
("[I]t was clearly established that the unnecessary use of force

against an unresisting, handcuffed pretrial detainee resulting in more than *de minimus* injuries is an excessive use of force in violation of the Due Process Clause."). Therefore, if the facts Mesmer presented in his sworn complaint prove true, qualified immunity could not apply.[12]

The excessive force claim cannot proceed, however, against all State Police Defendants. First, under either party's view of the facts, Linger was not personally involved in the acts of excessive force.[13] To be liable under 42 U.S.C. § 1983, there must be personal involvement by a defendant in the alleged violation. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that, in Section 1983 action, it must be "affirmatively shown that the official charged acted personally in the deprivation of plaintiff's rights"). The excessive force claims against Linger will be dismissed.

Moreover, the Maryland State Police is a department of the state government. Md. Code Ann., Pub. Safety § 2-201. Such departments are not persons and therefore cannot be sued under

---

[12] Even if one assumes that Mesmer was yelling at the officers at the time of the incident, "words alone do not justify the excessive use of force against a pretrial detainee." *Cobb*, 905 F.2d at 789.

[13] Redmond was allegedly involved in the actual beating, while Rezza provided the instruction to "slam" Mesmer if he moved.

42 U.S.C. § 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989); *see also Cleary v. Green*, No. CCB-07-1202, 2007 WL 4707635, at *2 n.1 (D.Md. Nov. 15, 2007) (stating that the Maryland State Police is not a person under Section 1983).[14]  As such, the excessive force claims against the State Police will also be dismissed.

## B.    Denial of Medical Care

Mesmer also alleges that the State Police Defendants and the St. Mary's Defendants denied him medical care.  "Only governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment."  *Young v. City of Mount Rainer*, 238 F.3d 567, 574 (4th Cir. 2001) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  "[C]onduct that amounts to 'deliberate indifference' [ ] is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim."  *Young*, 238 F.3d at 575 (citations omitted).  "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."  *Id.* at 575-76 (citations omitted).  This showing has two parts:

---

[14]    For the same reason, the denial of medical care claim will also be dismissed against the Maryland State Police.

> First, the evidence must show that the
> official in question subjectively recognized
> a substantial risk of harm. It is not
> enough that the officers should have
> recognized it; they actually must have
> perceived the risk. Second, the evidence
> must show that the official in question
> subjectively recognized that his actions
> were inappropriate in light of that risk.
> As with the subjective awareness element, it
> is not enough that the official should have
> recognized that his actions were
> inappropriate; the official actually must
> have recognized that his actions were
> insufficient.

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302-303 (4th Cir. 2004) (internal citations and quotations omitted). "Conduct that is merely negligent, or even reckless, is insufficient." *Brown v. Middleton*, 362 F.App'x. 340, 344 (4th Cir. 2010).

Summary judgment is appropriate on the denial of medical care claim against the St. Mary's Defendants. Taking the facts in the light most favorable to Mesmer, he arrived at the SMCDC disoriented and passing in and out of consciousness. In the ordinary case, such behavior might suggest to a reasonable person that a Mesmer was suffering from a substantial medical issue. The St. Mary's Defendants, however, were informed that Mesmer had been arrested on alcohol-related offenses and were told that Mesmer was still intoxicated, a fact buttressed by the breathalyzer results obtained when Mesmer was admitted. Even under Mesmer's view of the facts, he was at times awake, ambulatory, and talking coherently enough to speak with the

detention officers. Thus, it would be reasonable for them to assume that Mesmer's symptoms stemmed from his intoxication and not from a serious head injury. It was also unsurprising that Mesmer would be placed in a holding cell, given that the officers believed he was intoxicated. Although Mesmer notes that head injury symptoms can be similar to those of intoxication, that fact actually proves the St. Mary's Defendants' point that the most they were guilty of was a simple misdiagnosis. Such a misdiagnosis does not sustain a Section 1983 claim. *See, e.g.*, *Sosebee v. Murphy*, 797 F.2d 179, 181 (4th Cir. 1986) (finding no deliberate indifference where inmate was misdiagnosed with gastritis but actually suffered from steak bone piercing his esophagus). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

When Mesmer's symptoms apparently escalated, prison officials gave him medical attention. Medics came to the holding cell where Mesmer was incarcerated and evaluated him. Although Defendants aver that there were no evident abnormalities, the staff ultimately made the decision to send him to the hospital. The fact that Defendants presented Mesmer to the District Court Commissioner before sending him to the hospital – adding an additional delay of up to an hour and a

half - does not evidence deliberate indifference to a substantial risk of harm. *See, e.g.*, *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (finding no violation of due process where detainee did not receive medical treatment for fourteen hours, despite cut over eye and glass in palm); *accord Romero v. Barnett*, No. DKC-09-2371, 2010 WL 3056628, *7 (D.Md. Aug. 2, 2010) (finding no deliberate indifference where prisoner received medical care within 48 hours of initial complaint of shoulder injury). In short, the most that can be said is that detention center personnel mistakenly relied on certain objective facts to disregard Mesmer's initial requests for treatment. Nevertheless, Mesmer still received treatment within a short time and there is no suggestion that the delay caused him additional harm.

In addition, local governmental entities like St. Mary's County have no respondeat superior liability under Section 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Municipalities are directly liable for constitutional deprivations only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694; *see also Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987), *cert. denied sub nom.*, 484 U.S. 1027 (1988). Mesmer does not contend that

the county had an official policy encouraging the denial of medical care. Perhaps more importantly, municipal liability in this context is dependent on an initial finding that a government employee violated a plaintiff's constitutional rights. *Dawson v. Prince George's Cnty.*, 896 F.Supp. 537, 540 (D.Md. 1995). Because the court will grant judgment in favor of the individual St. Mary's Defendants, the claim must also be dismissed as to St. Mary's County. As for the "St. Mary's County Sheriff, Department of Corrections," that defendant lacks legal identity and cannot be sued. *See Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989); *Tani v. St. Mary's Cnty.*, No. CCB-07-1924, 2008 WL 1990772, at *1 (D.Md. Mar. 31, 2008). Therefore, summary judgment must be entered for all the St. Mary's Defendants.

The denial of medical care claim must also be dismissed as to Linger. Mesmer has specifically disavowed any claim against Linger by arguing that Linger was not on the scene during any of the relevant events. As the court has already explained, there can be no Section 1983 liability without personal involvement.

The court cannot grant summary judgment, however, as to Rezza and Redmond. Viewing the facts in the light most favorable to Mesmer, these two troopers were well aware that Mesmer had his head slammed into (or through) a wall. They watched as Mesmer drifted in and out of consciousness and

partial consciousness. They saw Mesmer bleeding. Despite all this knowledge, the officers did not provide Mesmer with medical attention, but instead photographed him and sent him to SMCDC without informing detention officers of the injury.[15] Such facts, if proven, would evidence deliberate indifference.

Although unpublished, a recent opinion of the Court of Appeals for the Fourth Circuit is decidedly persuasive here. In *Scarbro v. New Hanover Cnty.*, 374 F.App'x 366, 368 (4th Cir. 2010), a detention officer executed a "takedown" on an inmate, slamming his head against a concrete floor. The Fourth Circuit determined that, following the incident, the guard was deliberately indifferent to the prisoner's serious medical need. *Id.* at 370. In particular, although the prisoner exhibited signs of substantial injury and displayed a deteriorating condition following the incident, the guard did not inform a treating nurse that he had used force on the prisoner and specifically denied that the prisoner had fallen. *Id.* Much like the officer in *Scarbro*, the troopers here acted with deliberate indifference if they did in fact fail to offer

_____

[15] Mesmer states that he informed the detention center of the incident at the barracks, while St. Mary's Defendants indicate that they learned about it when they contacted the police after Mesmer's medical call. Regardless, there is no indication that Rezza or Redmond passed word along that Mesmer had been injured.

assistance to a bleeding, semi-conscious detainee whose head had been pushed through a wall. *Accord Iko v. Shreve*, 535 F.3d 225, 243 (4th Cir. 2008) (finding officers acted with deliberate indifference to serious medical need when they did not obtain medical treatment for inmate who collapsed after use of force upon him). They exacerbated the situation by failing to inform the staff at SMCDC that Mesmer had struck his head.

Qualified immunity also will not shield Redmond and Rezza from liability. As a general matter, "[t]he right to adequate medical care had already been carefully circumscribed in the caselaw, with its objective and subjective components spelled out to ensure that only the most wanton indifference goes punished. The officers therefore had 'fair warning' that their conduct was unconstitutional." *Iko*, 535 F.3d at 243 n.12. (quotation marks and citations omitted). More specifically, it is easy to conclude that it would be a violation of clearly established law to deny a pretrial detainee immediate medical care while he sat bleeding in a semi-conscious stupor after several blows to the head and body. *Accord Johnson v. Warner,* No. 7:05cv00219, 2008 WL 619302, at *7 (W.D.Va. Mar. 5, 2008) (finding, in Eighth Amendment context, that officers would violate clearly established right by attacking prisoner and then denying him medical care). Summary judgment cannot be entered as to these two defendants.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss or, in the alternative, for summary judgment, filed by Defendants Maryland State Police, et al. will be granted in part and denied in part. The motion to dismiss or, in the alternative, for summary judgment, filed by Defendants St. Mary's County, et al. will be granted.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge